254 F.3d 289 (D.C. Cir. 2001)
 Canadian Association of Petroleum Producers, Petitioner
v.
Federal Energy Regulatory Commission, Respondent
Inland Pacific Energy Services Corporation, et al., Intervenors
Canadian Association of Petroleum Producers, et al. Petitioners
v.
Federal Energy Regulatory Commission, Respondent
Northwest Pipeline Corporation, et al., Intervenors
 No. 96-1336, 97-1343, 99-1488, 00-1019, 00-1391, and 00-1399
 United States Court of Appeals FOR THE DISTRICT OF COLUMBIA CIRCUIT
 Argued May 9, 2001
Decided July 13, 2001
 
 [Copyrighted Material Omitted]
 On Petitions for Review of Orders of the Federal Energy Regulatory Commission
 James H. Holt argued the cause for petitioner Canadian Association of Petroleum Producers and supporting intervenors Northwest Natural Gas Company, et al. in No. 96-1336. With him on the briefs were Jill M. Barker, Robert A. Nelson, Jr. and Paula E. Pyron. Sandra E. Rizzo and Edward A. Finklea entered appearances.
 Robert A. Nelson, Jr. argued the cause and filed the briefs for petitioner Northwest Natural Gas Company in No. 97-1343.
 Judith A. Albert, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent in Nos. 96-1336 and 97-1343. With her on the brief were Jay L. Witkin, Solicitor at the time the brief was filed, and Susan J. Court, Special Counsel. Janet K. Jones, Attorney, entered an appearance.
 Alex A. Goldberg argued the cause for intervenor Northwest Pipeline Corporation in Nos. 96-1336 and 97-1343. With him on the brief was Steven W. Snarr.
 Robert A. Nelson Jr. argued the cause for petitioners in No. 99-1488 et al. With him on the briefs were Edward A. Finklea and James H. Holt.
 Judith A. Albert, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent in No. 99-1488 et al. With her on the brief was Dennis Lane, Solicitor. Susan J. Court, Special Counsel, entered an appearance
 Alex A. Goldberg argued the cause for intervenor Northwest Pipeline Corporation in No. 99-1488 et al. With him on the brief were Steven W. Snarr and Timothy Muller.
 Before: Williams, Ginsburg and Rogers, Circuit Judges.
 Williams, Circuit Judge:
 
 
 1
 On October 1, 1992 Northwest Pipeline Corporation ("Northwest") filed for a general rate increase under 4 of the Natural Gas Act, 15 U.S.C. 717c, to cover costs associated with a previously authorized expansion of its natural gas pipeline facilities. The Federal Energy Regulatory Commission rejected certain proposed tariffs, accepted and suspended other proposed tariffs subject to refund, and set an evidentiary hearing. Almost a decade later, in two different consolidated cases, petitioners are seeking review of the relevant rate increase, which because of later filings by Northwest was in effect only from April 1, 1993 through October 31, 1994.
 
 
 2
 One of the cases involves issues that were resolved before we remanded to the Commission to consider the effect of a Commission policy change, the other involves issues resolved in the course of that remand. The first, Nos. 96-1336 and 97-1343 concerns five orders, the last of which issued in 1997.[1] The next year, in another proceeding, the Commission shifted positions on an important issue relating to the equity rate of return. See Transcontinental Gas Pipe Line Corp., 84 FERC p 61,084 at 61,423 (1998), order on reh'g, 85 FERC p 61,323 (1998), aff'd sub nom. North Carolina Utilities Comm'n v. FERC, 203 F.3d 53 (D.C. Cir. 2000) (unpublished opinion). Because of that shift, we remanded another case to the Commission for consideration of its possible effect. Williston Basin Interstate Pipeline Co. v. FERC, 165 F.3d 54, 62-63 (D.C. Cir. 1999). The Commission then sought a remand in this case, which we granted.
 
 
 3
 The later consolidated case, No. 99-1488 et al., involves the five orders issued after the remand.[2] On July 14, 1999 the Commission promulgated the first such order, finding that Northwest was entitled to a re-weighting of the shortand long-term growth rates in the equity return calculation. 88 FERC p 61,057 (1999) ("Initial Post Remand Order"). The Commission ordered Northwest to file a recalculation of its rates, a plan to impose surcharges to recover excess refunds under the previous rates, and pro forma tariff sheets that established the appropriate surcharges. Id. at 61,146. The Commission denied requests for rehearing. 88 FERC p 61,298 (1999) ("Initial Post Remand Order on Rehearing"). Northwest filed its tariff sheets in August 1999, using for its rate of equity return the median rate of the proxy group. On February 11, 2000 the Commission rejected Northwest's compliance filing because it used the wrong long-term growth rate, but approved its use of the median return on equity, stating that current Commission policy required the Commission to select the median of the range of reasonable returns on equity instead of the midpoint that had been used earlier in the rate-making proceeding. 90 FERC p 61,146 at 61,468 69 (2000) ("Median Rate Order"). The parties then agreed to a long-term growth rate. The Commission denied rehearing on the median rate issue. 92 FERC p 61,038 (2000) ("Median Rate Order on Rehearing").
 
 
 4
 Two parties, Northwest Natural Gas Company ("Northwest Natural"), a buyer of Northwest's gas, and the Canadian Association of Petroleum Producers ("CAPP"), a representative of buyers, assert a variety of errors in the Commission's decisions. We review the Commission's determinations under the Administrative Procedure Act's arbitrary and capricious standard. See Missouri Public Service Comm'n v. FERC, 215 F.3d 1, 3 (D.C. Cir. 2000); 5 U.S.C. 706(2)(A). We dismiss one claim for want of jurisdiction, we reverse and remand with respect to another claim, and we affirm on the remaining issues. All of the petitioners' claims not addressed here have been considered and rejected.
 
 
 5
 * * *
 
 
 6
 The "just and reasonable" rates calculated by the Commission under 15 U.S.C. 717c(a) are typically based on a pipeline's costs. Because several of the issues here revolve around one component, the cost of equity capital, we pause briefly to explain it. Each year that a durable utility asset is in use imposes on the utility the annual cost of the capital used for its construction (net of amounts already recovered in depreciation charges). In order to attract capital, a utility must offer a risk-adjusted expected rate of return sufficient to attract investors. This return to investors is the cost to the utility of raising capital. For the portion of capital acquired through bonds, the cost is comparatively easy to compute--the interest the company must pay its bondholders. Common equity is more complicated, for equity investors do not have a legally fixed return. To calculate the rate of return necessary to attract them, the Commission measures the return enjoyed by the company's equity investors by the discounted cash flow ("DCF") model, which assumes that a stock's price is equal to the present value of the infinite stream of expected dividends discounted at a market rate
 
 
 7
 commensurate with the stock's risk. With simplifying assumptions, this can be summarized by the formula
 
 P = D/(r-g)
 
 8
 where P is the price of the stock at the relevant time, D is the dividend to be paid at the end of the first year, r is the rate of return and g is the expected growth rate of the firm. See Illinois Bell Telephone Co. v. FCC, 988 F.2d 1254, 1259 (D.C. Cir. 1993); see also A. Lawrence Kolbe et al., The Cost of Capital: Estimating the Rate of Return for Public Utilities 53-55 (1984). Since r is what the Commission is seeking, the equation is rearranged to the form
 
 
 9
 r = D/P + g
 
 
 10
 Illinois Bell, 988 F.2d at 1259.
 
 
 11
 For a company that is not publicly traded, marketdetermined figures for P and D will be missing, and the Commission has recourse to calculating the implicit rate of return on companies that are comparable (or at least companies whose business is predominately the operation of natural gas pipelines) and publicly traded. These companies are called the "proxy group." The Commission then makes adjustments for specific characteristics of the company whose rates are in question. Here, one of the issues involves a contention that Northwest's business risk was comparatively low (so that, petitioners argue, the Commission should have chosen a rate at the low end of those of the proxy group). Another issue involves calculation of the expected growth rates for the proxy group. And a third, assuming that Northwest belongs in the middle of the proxy group, involves how to pick a number best representing the middle.
 
 
 12
 * * *
 
 1. Inclusion of Over-Run Costs in Rate Base
 
 13
 In its expansion project Northwest added considerable mainline pipeline and compressor facilities and services. Its original filing included $371.2 million in project costs but it ultimately persuaded the Commission to include about $61 million more. Because of decisions adverse to Northwest on
 
 
 14
 other issues, the rates approved were lower than those for which it had originally filed. See 71 FERC p 61,253 at 61,992-95 (1995)("Opinion No. 396"), reversed in part and remanded, 76 FERC p 61,068 at 61,420-24 (1996) ("Opinion No. 396-A").
 
 
 15
 Northwest Natural claims that Northwest should not be permitted to incorporate into its rate base costs that were not included in its original filing. Its back-up position is that even if consideration of those costs was proper, the Commission should have reopened proceedings to consider its claim that about $48 million in costs was not actually paid within the "test period" (twelve consecutive months used, with adjustments, in estimating a pipeline's costs) and should have been excluded.
 
 
 16
 On the first claim, Northwest Natural argues that an earlier Commission decision, Natural Gas Pipeline Co. of America, 38 FPC 1136 (1967), governs how the Commission must deal with cost figures that differ from those of the initial filing. It places special reliance on a phrase of that decision saying that the regulations "bind Natural to its case-in-chief as submitted." Id. at 1148. The phrase is indeed there, but the Commission went on to make clear that there was no flat rule against new data; instead it performed a contextual analysis. There (1) the evidence did not fit the very limited subject of the hearing; (2) because of that disjuncture there was a risk that other parties would reasonably assume that the evidence would not be considered (and accordingly these parties would lack effective notice); and (3) the new cost evidence in fact did not meet the Commission's requirement that changes in costs after the test period be "known and measurable." Id. at 1148-50 (internal quotation omitted). None of these characteristics was present here. The Commission found that because Northwest's revised costs were disclosed prior to the filing of direct testimony in the hearing before the Administrative Law Judge, that the parties had ample notice of the cost claims, and that such claims, though estimates, were known and measurable. See Opinion No. 396-A, 76 FERC at 61,423-24.
 
 
 17
 In its second claim Northwest Natural argues that the Commission unlawfully refused to reopen proceedings to hear its claim that Northwest had not actually paid all of the expansion costs within the test period. The claim has two strikes against it. First, although Northwest Natural was aware of the change in plant costs well before direct testimony was filed in the ALJ hearing, it failed to raise the issue there, and did not do so until the record closed. Id. at 61,420. Northwest Natural's justification for the delay, if any, is obscure. Second, Northwest Natural's position on the merits depends on its effort to transform the Commission's general practice of not including costs paid after the test period into an absolute bar. But the Commission has discretion to consider costs outside of the test period. See, e.g., Exxon Corp. v. FERC, 114 F.3d 1252, 1263 (D.C. Cir. 1997). Here it is uncontested that Northwest placed the expansion facilities in service before the end of the test period, i.e., just before the start of the period for which the rates were charged. Payment in some cases occurred after the end of the test period, but only because some bills had not been paid by that day, some incurred costs had not been billed, and some sums were withheld by Northwest pending final completion of the work. See Nos. 96-1336 and 97-1343, Joint Appendix ("J.A.") at 390.
 
 
 18
 Northwest Natural also claims discriminatory treatment in the Commission's reopening refusal, as the Commission did reopen proceedings to consider the long-term growth projections. But it did so exclusively in light of its own intervening decision in Ozark Gas Transmission System, 68 FERC p 61,032 at 61,105 (1994), announcing a new policy to include such projections. Such an effort by the Commission to assure that it applies similar principles in simultaneously pending cases may be obligatory. See Williston Basin, 165 F.3d at 61-63. It supplies, in any event, an ample basis for the Commission's different treatment of the two requests for reopening. Cf. American Financial Services Ass'n v. FTC, 767 F.2d 957, 964-65 n.5 (D.C. Cir. 1985) (noting Commission discretion to reject belated claims).
 
 2. Assessment of Northwest's Business Risk
 
 19
 As part of its process to determine Northwest's rate, the Commission assessed Northwest's costs of capital. This estimation required, under the DCF method that the Commission used, calculating the implicit equity rate of return for a proxy group of supposedly similar corporations, and then determining where Northwest belonged within that group, in large part on the basis of Northwest's business risk. CAPP complains that the Commission didn't adequately consider evidence suggesting that Northwest's business risk was in fact lower than the average of the proxy group, so that it erred in assigning Northwest a rate based on the middle of the proxy group range. CAPP's theory was that Northwest was more like the "pure" pipeline companies within the proxy group, which had lower rates of return, than like the companies with more diversified operations. We do not review the merits of CAPP's petition because it is procedurally barred.
 
 
 20
 Four of the Commission's orders prior to our remand are relevant. We start with a very simple summary of each relevant order, what it did, and the nature of CAPP's petition for rehearing in the instances where it filed one.
 
 
 21
 Opinion No. 396. The Commission rejected CAPP's contention that Northwest's business risk was below the average of the proxy group. 71 FERC p 61,253 at 61,992 (1995). CAPP petitioned for rehearing, raising the issue of business risk.
 
 
 22
 Opinion No. 396-A. The Commission remanded the matter to the ALJ for development of a record on longterm growth rates. 76 FERC p 61,068 at 61,419 (1996). It said nothing at all about the business-risk issue. CAPP did not seek rehearing, but petitioned for review in this court of both Opinion No. 396 and Opinion No. 396-A.
 
 
 23
 Opinion No. 396-B. Following the proceedings before the ALJ, the Commission identified a new range of rates for the proxy companies and selected the mid-point of that range as appropriate for Northwest. 79 FERC p 61,309 at 62,384-86 (1997). Northwest sought rehear ing in a petition that did not mention the business risk issue.
 
 
 24
 Opinion No. 396-C. The Commission disposed of the petitions for rehearing. 81 FERC p 61,036 (1997). Northwest petitioned for review here.
 
 
 25
 The Commission argues that neither of the first two opinions, No. 396 or No. 396-A, was final, which is a prerequisite to our review. See Transwestern Pipeline Co. v. FERC, 59 F.3d 222, 226 (D.C. Cir. 1995). That seems obvious for Opinion No. 396-A, as it remanded the matter to an ALJ. See id. ("An order is considered final when it imposes an obligation, denies a right, or fixes some legal relationship, usually at the consummation of an administrative process.") (internal quotation omitted). Opinion No. 396 was presumably a final decision when issued, but when CAPP sought rehearing under 19(a) of the Natural Gas Act, 15 U.S.C. 717r(a) (as it was required to do if it wished to preserve its right to appeal, see 19(b), 15 U.S.C. 717r(b)), its petition suspended the finality of Opinion No. 396 as applied to CAPP and precluded appeal until the Commission fully resolved the rehearing request by way of another final order. See Tennessee Gas Pipeline Co. v. FERC, 9 F.3d 980, 980-81 (D.C. Cir. 1993). Cf. Bellsouth Corp. v. FCC, 17 F.3d 1487, 1489-90 (D.C. Cir. 1994). Because Opinion No. 396-A itself was nonfinal, CAPP's petition for review of both decisions was jurisdictionally defective.
 
 
 26
 CAPP did, however, seek review of Opinion No. 396-C, thereby bringing up issues properly preserved from Opinion No. 396-B. But was the business risk issue, raised only on rehearing of Opinion No. 396, preserved? Section 19(b)'s rehearing requirement itself applies "not to the issue involved, but to the order that comes before us for review." Kansas Cities v. FERC, 723 F.2d 82, 85 (D.C. Cir. 1983) (construing materially identical language in 313(a) of the Federal Power Act); see also Arkansas Louisiana Gas Co. v. Hall, 453 U.S. 571, 577 n.7 (1981) (discussing established practice of citing interchangeably provisions of the Natural Gas Act and the Federal Power Act that are substantially identical in all material respects). As our review applies only to final orders, all appealable claims must generally be set forth in a petition for review of the final order itself. Of course, a party that has petitioned for rehearing and seen its petition denied without significant modification to the order may then proceed directly to court without filing a new petition for rehearing of the denial; imposing an additional rehearing requirement in this situation would lead to infinite regress and serve no useful end. See Town of Norwood v. FERC, 906 F.2d 772, 775 (D.C. Cir. 1990); Southern Natural Gas Co. v. FERC, 877 F.2d 1066, 1072-73 (D.C. Cir. 1989); see also Kansas Cities, 723 F.2d at 86. Similarly, if a party properly seeks rehearing and secures modification of some parts of an order, it may go directly to court on the issues as to which there was no modification without seeking rehearing again on those issues; only on matters where the rehearing order introduces a new source of complaint need the party file another rehearing petition. Norwood, 906 F.2d at 775; Tennessee Gas Pipeline Co. v. FERC, 871 F.2d 1099, 1109-10 (D.C. Cir. 1989). And we will assume without deciding that if a party does raise such new issues on rehearing it need not include its old complaints about the unmodified parts.
 
 
 27
 In the present case, however, several stages of agency review and modification separate Opinion No. 396-B from CAPP's petition for rehearing of Opinion No. 396--proceedings before the ALJ on the long-term/short-term weighting issue, followed by Commission resolution of that issue and its selection of a new equity rate of return for Northwest. Enforcement of the rehearing requirement in this context serves not merely to inform the Commission of issues that may be appealed, but ensures certainty in the dispute process, apprising potentially settling parties of what issues remain contested. See ASARCO, Inc. v. FERC, 777 F.2d 764, 773-74 (D.C. Cir. 1985). We note, moreover, that CAPP does not argue, nor do we see any basis for finding, that its failure to preserve its right to appeal was justified under the "reasonable ground" exception to Section 19(b)'s rehearing requirement. Accordingly, CAPP's petition is dismissed for lack of jurisdiction.
 
 
 28
 3. Weighting of Shortand Long-Term Growth Rates.
 
 
 29
 On remand, the Commission changed the weighting of shortand long-term growth rates, now giving short-term rates twice the weight of long-term ones, rather than weighting them equally as before. The petitioners claim that the Commission failed to explain its decision generally or to distinguish Ozark Gas Transmission System, 68 FERC p 61,032 (1994), where the Commission approved an equal weighting of all years of an 18-year period. Id. at 61,107 n.46. To explain its decision, the Commission quoted its reasoning in Transcontinental Gas Pipe Line Corp., 84 FERC p 61,084 at 61,423 (1998):
 
 
 30
 [W]hile determining the cost of equity nevertheless requires that a long-term evaluation be taken into account, long-term projections are inherently more difficult to make, and thus less reliable, than short-term projections. Over a longer period, there is a greater likelihood for unanticipated developments to occur affecting the projection. Given the greater reliability of the short-term projection, we believe it is appropriate to give it greater weight. However, continuing to give some effect to the long-term growth projection will aid in normalizing any distortions that might be reflected in short-term data limited to a narrow segment of the economy.
 
 
 31
 Initial Post Remand Order, 88 FERC at 61,144; see also Initial Post Remand Order on Rehearing, 88 FERC at 61,910. The Commission was obviously aware that the apparent relative reliability of short-term growth projections (due to temporal proximity) was to some degree offset by variability; it decided to use the long-term projections to "normaliz[e] any distortions" in the short-term expectations. In an exercise so hard to limit by strict rules, it would likely be difficult to show that the Commission abused its discretion in the weighting choice. Certainly petitioners offer no reason for us to find that it has done so here. Its reason for giving extra weight to the short-term estimates implicitly justified its change from Ozark.
 
 
 32
 4. Choice of the Median Rate of Return on Equity.
 
 
 33
 On remand the Commission also changed its method of selecting an equity rate of return from the array of rates of the proxy group. Before the remand it had chosen the "midpoint" rate of the group--the average of the single lowest and single highest rates. See Tennessee Gas Pipeline Co. v. FERC, 926 F.2d 1206, 1213 (D.C. Cir. 1991) (stating that the midpoint is a "starting place"). When Northwest submitted its pro forma tariff sheets as mandated by the Commission's July 14, 1999 order, however, it recalculated its rates using the median of the proxy group (the middle rate out of the five), which the Commission approved. See Median Rate Order, 90 FERC at 61,468. When the shortand long-term growth rates had been equally weighted, the midpoint rate was higher than the median rate, leading to a higher overall pipeline rate. With the change in weighting, the reverse was true. See Median Rate Order on Rehearing, 92 FERC at 61,095, 61,101. Petitioners estimate that the difference between the midpoint (13.33%) and median (13.67%) spells $3.2 million in added charges. They raise two objections. First, they claim that the Commission had no authority to reconsider how it selected a rate from the proxy group under the scope of our remand. Second, they argue that the Commission's choice of the median was unreasonable.
 
 
 34
 We remanded to the Commission to enable it "to reconsider its decisions in light of Williston Basin v. FERC, 165 F.3d 54 (D.C. Cir. 1999)." See Canadian Ass'n of Petroleum Producers v. FERC, No. 96-1336 (D.C. Cir. Mar. 26, 1999) (order remanding case), Petitioners' Br. at Addendum B. This prescribed affirmatively what the Commission was required to do--reconsider the weighting issue that was directly affected by Williston. But under our cases such a remand restores jurisdiction to the Commission and "discretion to reconsider the whole of its original decision." Southeastern Michigan Gas Co. v. FERC, 133 F.3d 34, 38 (D.C. Cir. 1998). Because the Commission was within its authority to reconsider which rate of return to use, we reach the question whether the Commission provided a reasoned explanation for choosing the median over the midpoint or alternatively the mean.
 
 
 35
 The Commission's orders and brief speak only to the choice between median and midpoint. Its orders pointed to the Transcontinental decision, where, besides changing the weighting of shortand long-term growth factors, it also selected the median instead of the midpoint. But it supplied only the most limited reasoning there. See Transcontinental Gas Pipe Line Corp., 84 FERC at 61,427-5. The Commission essentially reiterated its Transcontinental reasoning in this case:
 
 
 36
 [U]se of the median gives consideration to more of the proxy company numbers. The median is the point at which half of the numbers are higher and half are lower. The midpoint, on the other hand, merely represents an average of the highest and lowest of the numbers and completely disregards the middle three numbers.
 
 
 37
 Median Rate Order on Rehearing, 92 FERC at 61,095.
 
 
 38
 To a large extent this "explanation" merely describes the differences in calculating the median and the midpoint. Insofar as it seeks to justify on the basis of the number of numbers considered, it is not wholly accurate. The midpoint doesn't "completely disregard[ ] the middle three numbers"; the highest and lowest numbers achieve their status by reference to all five numbers. But even if acceptable as an explanation for choosing the median over the midpoint, it fails as an explanation for rejecting petitioners' proposal that the Commission use the simple arithmetic mean (either of all five, or of the middle three companies of the proxy group). See No. 99-1488 et al., J.A. at 105, 171, 192-93. The mean of the five, after all, rather directly "uses" all the numbers and weights them all equally, as petitioners pointed out. Id. at 192-93.
 
 
 39
 The Commission simply dismissed the alternative proposal in conclusory terms. See Median Rate Order, 90 FERC at 61,468; Median Rate Order on Rehearing, 92 FERC at 61,094. Counsel for Northwest suggested at oral argument that there was Commission precedent for the view that the median is to be preferred to the average "as a [measure] of central tendency in cases in which the distribution is highly skewed." See No. 99-1488 et al., Oral Arg. Tr. at 22. But the Commission never offered such an explanation, and counsel did not offer an analysis of Commission precedents from which we could infer that the "skewing" here was such that choice of the median was foreordained. See SEC v. Chenery Corp., 332 U.S. 194, 196 (1947); cf. Health & Medicine Policy Research Group v. FCC, 807 F.2d 1038, 1045 (D.C. Cir. 1986).
 
 
 40
 The Commission's failure to respond meaningfully to calls for using an average rate of all or of three of the proxy group companies renders its decision to use the median rate arbitrary and capricious. See City of Brookings Municipal Telephone Co. v. FCC, 822 F.2d 1153, 1169 (D.C. Cir. 1987). Unless the Commission answers objections that on their face seem legitimate, its decision can hardly be classified as reasoned. See International Harvester Co. v. Ruckelshaus, 478 F.2d 615, 648 (D.C. Cir. 1973); see also Tesoro Alaska Petroleum Co. v. FERC, 234 F.3d 1286, 1294 (D.C. Cir. 2000). We thus reverse and remand the case to the Commission for reconsideration of its choice of the proxy group's median rate.
 
 5. Imposition of Surcharges
 
 41
 The Commission determined on remand that it had improperly reduced Northwest's rates in its first series of orders and consequently ordered Northwest to impose surcharges to recover those excess refunds from its shippers. Petitioners claim that the surcharges violated the filed rate doctrine, "which forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority," Arkansas Louisiana Gas Co., 453 U.S. at 577, and are thus unauthorized. Petitioners make no claim that the ultimately effective rate (net of refunds and surcharges) exceeded that of Northwest's original filing.
 
 
 42
 Petitioners rely on Natural Gas Clearinghouse v. FERC, 965 F.2d 1066 (D.C. Cir. 1992), to argue that Northwest could not collect surcharges unless it had explicitly reserved its right to impose surcharges under the tariffs that produced the refunds. But petitioners read too much into Clearinghouse. Although the pipeline in that case had specifically reserved the right to impose surcharges when it was ordered to file a new, lower tariff, we did not hold that such a reservation was necessary. So long as the parties had adequate notice that surcharges might be imposed in the future, imposition of surcharges does not violate the filed rate doctrine. "The filed rate doctrine simply does not extend to cases in which buyers are on adequate notice that resolution of some specific issue may cause a later adjustment to the rate being collected at the time of service." Id. at 1075. (It is not even clear that the refunds were paid during the period service was actually being provided under the "locked-in" rate at issue here. But petitioners lose whether they were or were not.) The Commission reasonably concluded that Northwest's initial rate filing--combined with the ongoing litigation and absence of a final, non-appealable order--provided the necessary notice to the shippers that they might have to pay rates up to the level originally filed. See Western Resources, Inc. v. FERC, 72 F.3d 147, 151 (D.C. Cir. 1995).
 
 
 43
 * * *
 
 
 44
 CAPP's petition for review is dismissed for want of jurisdiction on the business-risk issue. The case is reversed and remanded to the Commission for further consideration of the selection of the median rate of return on equity from the proxy group. Otherwise, the petitions are denied.
 
 
 45
 So ordered.
 
 
 
 Notes:
 
 
 [1]
 The five are: Opinion No. 396, 71 FERC p 61,253 (1995); Opinion No. 396-A, 76 FERC p 61,068 (1996); 78 FERC p 61,289 (1997); Opinion No. 396-B, 79 FERC p 61,309 (1997); Opinion No. 396-C, 81 FERC p 61,036 (1997). Unless stated otherwise, all FERC orders cited in this decision have the title "Northwest Pipeline Corporation."
 
 
 [2]
 88 FERC p 61,057 (1999); 88 FERC p 61,298 (1999); 89 FERC p 61,238 (1999); 90 FERC p 61,146 (2000); 92 FERC p 61,038 (2000).