**CANADIAN ASSOCIATION OF PETROLEUM PRODUCERS, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

**Northwest Pipeline Corporation, Intervenor.**

No. 00–1498.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 5, 2002.

Decided Oct. 25, 2002.

On Petition for Review of Orders of the Federal Energy Regulatory Commission.

James H. Holt argued the cause and filed the briefs for petitioner.

Judith A. Albert, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were Cynthia A. Marlette, General Counsel, and Dennis Lane, Solicitor.

Steven W. Snarr, Alex A. Goldberg, and Timothy W. Muller were on the brief for intervenor Northwest Pipeline Corporation.

Before: GINSBURG, Chief Judge, and SENTELLE and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Chief Judge GINSBURG.

GINSBURG, Chief Judge:

The Canadian Association of Petroleum Producers petitions for review of two orders of the Federal Energy Regulatory Commission approving an increase in the rates charged by Northwest Pipeline Corporation for transporting natural gas. The CAPP contends that the Commission allowed Northwest an excessive rate of return on equity (ROE), resulting in unduly high rates. Because the CAPP failed in its request for rehearing before the Commission to raise its current challenge to the proxy group range of ROEs upon which the Commission based Northwest's ROE, we lack jurisdiction to consider, and therefore dismiss, that aspect of its petition. Because the Commission's decision to place Northwest at the median of the proxy group range was reasonable and supported by substantial evidence, we deny the remainder of the petition.

## I. Background

In 1995 Northwest applied for a general rate increase that would raise its revenues by $19.2 million per year. The Commission, pursuant to its authority under § 4 of the Natural Gas Act, 15 U.S.C. § 717c, to regulate rates for interstate gas transmission, scheduled an evidentiary hearing before an Administrative Law Judge to consider, among other things, the appropriate rate of return on the equity invested in the pipeline.

The Commission uses a discounted cash flow (DCF) analysis to determine the appropriate ROE for a regulated pipeline company. *See Canadian Association of Petroleum Producers v. F.E.R.C.*, 254 F.3d

289, 293 (D.C.Cir.2001) ("*CAPP I*"). For a publicly-traded company, DCF analysis provides an estimate of ROE based upon the price of the company's stock, the dividend it pays, and projected growth in its earnings. *Id.* For a company that is not publicly traded, such as Northwest,

> the Commission has recourse to calculating the implicit rate of return on companies that are comparable (or at least companies whose business is predominantly the operation of natural gas pipelines) and publicly traded. These companies are called the "proxy group." The Commission then makes adjustments for specific characteristics of the company whose rates are in question.

*Id.* at 294.

Northwest proposed to calculate its ROE using a DCF analysis of a "proxy group" composed of six companies. The CAPP, through its expert witness Malcolm Ketchum, challenged the representativeness of that group based upon a "fundamental and continuing evolution taking place in the portfolio of business ventures" in which the proxy companies were engaged. According to Mr. Ketchum, deregulation had enabled pipeline companies to diversify by segregating "pure pipeline" gas transmission operations into affiliated entities and then pursuing related—or, indeed, unrelated—lines of business that posed higher risks but offered greater potential for earnings growth. A higher estimate of growth, when factored into the Commission's DCF analysis, results in a higher ROE than would be required to attract investment in a less risky, pure pipeline company. Therefore, Mr. Ketchum argued, the Commission should supplement its DCF analysis with "a critical assessment of the relative business risks faced by a pure regulated pipeline, such as Northwest."

The ALJ did not adjust the proxy group range of ROEs upon the basis of Mr. Ketchum's analysis. Neither, however, did the ALJ accept Northwest's ROE figure, which was based upon a DCF analysis using only short-term growth projections. Instead, using the Commission's then-prevailing DCF methodology, the ALJ calculated the proxy group range by giving equal weight to short- and long-term growth projections. *See Northwest Pipeline Corp.*, 87 F.E.R.C. ¶ 61,266 at 62,058, 1999 WL 357897 (June 1, 1999) ("*Order*"). Based upon Northwest's risk profile, the ALJ then placed Northwest at the midpoint of the proxy group range. *Id.*

The Commission modified the ALJ's calculation of the proxy group range in keeping with an intervening decision, *Transcontinental Gas Pipe Line Corp.*, 84 F.E.R.C. ¶ 61,084, 1998 WL 608596 (July 29, 1998) ("*Transco*"), in which the Commission had decided to give short-term growth projections more weight than long-term growth projections in its DCF calculations. *Order* at 62,061. As for placement of Northwest within the range, the Commission analyzed the company's competitive circumstances and the status of its contracts for the delivery of gas to users, and affirmed the ALJ's finding that Northwest faced an average level of risk. In another modification stemming from *Transco*, however, the Commission placed Northwest, as a company of average risk, at the median rather than the midpoint of the proxy group range of ROEs. *Id.* at 62,068. The Commission noted but, curiously, did not address the CAPP's argument that the ALJ had erred by failing to take into account, when placing Northwest within the range, the difference in risk between Northwest and the companies in the proxy group. *Order* at 62,065.

The CAPP sought rehearing of the *Order* in two respects relevant here. First,

the CAPP argued that the Commission had erred in placing Northwest at the median of the proxy group range. Specifically, the CAPP challenged the Commission's finding that Northwest faced significant competition and argued that the Commission's analysis of Northwest's contracts was flawed. Again curiously, however, the CAPP did not protest the Commission's failure to address the CAPP's argument for adjusting Northwest's position within the range to account for differences between Northwest and the proxy companies.

Rather, the CAPP relied upon those differences to support its second ground for rehearing, namely, that the Commission, in determining the proxy group range, should not have applied the recently-revised weighting formula adopted in *Transco*. The CAPP argued that short-term growth projections were influenced by the non-pipeline businesses of the proxy group companies and thus skewed upward the range of ROEs for the proxy group.

The Commission rejected both the CAPP's arguments. *Northwest Pipeline Corp.*, 92 F.E.R.C. ¶ 61,287, 2000 WL 1457024 (Sept. 29, 2000) ("*Rehearing Order*"). First, the Commission adhered to its position in *Transco* that short-term growth projections are inherently more reliable than long-term growth projections, and therefore should be weighted more heavily. *Id.* at 62,003–04. Acknowledging that "there may be some differences between the proxy companies and Northwest," the Commission was satisfied nevertheless that the proxy group comprised "the six publicly traded companies whose operations most closely mirror the operations of a pure pipeline company." *Id.* at 62,005. Second, the Commission reiterated its conclusion that Northwest faced average business risks stemming from actual and potential competition and from a short

average contract life relative to the depreciable life of its facilities. *Id.* at 62,006–08.

## II. Jurisdiction

Before addressing the merits of the CAPP's petition for review, we consider, at the Commission's urging, a jurisdictional question arising from the difference between the CAPP's position here and what it urged before the Commission in its request for rehearing. Upon the CAPP's motion, we held the briefing in this case in abeyance pending our disposition of *CAPP I*, a related petition in which we upheld the Commission's relative weighting of short- and long-term growth projections in calculating the proxy group range of ROEs. 254 F.3d at 297. In the wake of that decision the CAPP abandoned the similar challenge it had raised in its rehearing request before the Commission in this case. Instead, the CAPP now argues—as it had in earlier stages of the proceedings before the Commission—that the Commission should have adjusted Northwest's placement within the range to account for the differences between Northwest and the proxy group companies.

■ Section 19(b) of the Natural Gas Act, 15 U.S.C. § 717r(b), provides that "[n]o objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure to do so." The Commission contends that because the CAPP's rehearing argument was limited to challenging the Commission's decision to afford greater weight to short-term growth projections, the CAPP is barred from arguing on review for an adjustment to Northwest's placement within the range based upon a challenge to the representativeness of the proxy group. The CAPP responds that it has consistently objected

that "the use of growth estimates representative of growth in diversified, unregulated businesses produces an unreasonable ROE for FERC-regulated pipelines," and that the Commission is merely quibbling about a difference in the particular manner in which that objection was raised in different contexts.

■ To evaluate the CAPP's point, one must bear in mind that the Commission's process for setting the ROE for a non-publicly traded pipeline company consists of two discrete phases: (1) determination of the range of reasonableness and of its median; * and (2) assessment of the individual pipeline company's circumstances and "other factors" to determine whether to make a "pragmatic adjustment" away from the median. *Tennessee Gas Pipeline Co. v. F.E.R.C.*, 926 F.2d 1206, 1209 (D.C.Cir.1991). In its request for rehearing, the CAPP challenged the Commission's weighting policy, which is part of the first phase. Accordingly, the Commission addressed the CAPP's argument in its discussion of the DCF methodology, a significant portion of which was devoted to defending its weighting policy. *Rehearing Order* at 62,001–05.

The CAPP did not urge, as it now does, that the difference in riskiness between the proxy group and a pure pipeline company should be accounted for in the second phase—the company's placement within the range. Had the CAPP done so, then the Commission might have come out differently in its rehearing order. Or it might not have. That the matter is open to such speculation, however, concludes the point; the "obvious purpose" of the rehearing requirement "is to afford the Commission the first opportunity to consider, and perhaps dissipate, issues which are

headed for the courts." *Moreau v. F.E.R.C.*, 982 F.2d 556, 564 (D.C.Cir.1993) (emphasis omitted). The CAPP's decision upon rehearing to focus its argument about the differences between Northwest and the proxy companies solely upon the initial calculation of the range of ROEs denied the Commission the opportunity to consider the precise challenge the CAPP now raises for judicial review. This we cannot countenance. *See New Jersey Zinc Co. v. F.E.R.C.*, 843 F.2d 1497, 1502–03 (D.C.Cir.1988) (finding no jurisdiction where specific objection was not made in rehearing application, despite claim it was encompassed by "overarching objection"). Simply put, the court cannot review what the Commission has not viewed in the first instance.

Nor do we see any "reasonable ground" for the CAPP's failure to renew in its rehearing request its argument that the Commission must take Mr. Ketchum's analysis into account when locating Northwest within the proxy range of ROEs. The CAPP protests that in seeking rehearing it "placed its objection in the context of the weighting not because that was the only means, or even CAPP's preferred means, of addressing [it] ... but because the revised weighting was the only portion of the Commission's order in which the FERC made any mention of the growth estimates." The CAPP's tactical decision to "frame its objection to conform to the way the Commission was interpreting the issue" *cannot* be accepted, however, *in mitigation* of the CAPP's failure also to present its argument for a downward adjustment. We therefore conclude that we are without jurisdiction to consider, and must dismiss, the portion of the CAPP's petition

---

* In *CAPP I*, we remanded to the Commission for further consideration its use of the median of the proxy group range. 254 F.3d at 297–

99. In this case, the CAPP does not challenge the Commission's use of the median, and we express no opinion upon that issue.

challenging the representativeness of the proxy group.

## III. The Merits

■ The CAPP also challenges the Commission's determination that, in light of Northwest's competitive circumstances and the duration of its long-term transmission contracts, the pipeline company faced average levels of business risk and therefore should earn a ROE at the median of the proxy range. We review the Commission's factual findings for substantial evidence, 15 U.S.C. § 717r(b), and conclude that the CAPP's objections are without merit.

The record demonstrates that Northwest does not have a monopoly in the geographic market it serves; customers do have alternatives and have made use of them. For example, Tuscarora Gas Transmission Company beat out Northwest for a major contract in Nevada, while Pacific Gas Transmission Company competes with Northwest in Washington, Oregon, and Northern California. In addition, the Commission identified competitive threats, such as the application of BC Gas to enter Northwest's region and the potential for industrial customers to bypass Northwest's system by connecting directly with a gas producer. Although the CAPP faults the Commission for relying in part upon evidence portending future competition, in neither *Williams Natural Gas Co.*, 77 F.E.R.C. ¶ 61,277, 1996 WL 862628 (Dec. 19, 1996), nor *Ozark Gas Transmission Sys.*, 68 F.E.R.C. ¶ 61,032, 1994 WL 363498 (July 7, 1994), upon which the CAPP relies, did the Commission announce a blanket rule against considering potential competitive threats. Indeed, because the ROE necessary to attract investment depends upon market perception of future risks, such a rule would make little sense. The Commission therefore reasonably factored evidence of potential competition into its ROE calculus.

The Commission also addressed adequately the CAPP's contention that Northwest's exposure to risk is reduced by the buoyant demand for gas in the area it serves. That other states outside the region experienced similar and even greater increases in consumption led the Commission reasonably to conclude that growth in demand was not "abnormally" high in Northwest's territory. *Rehearing Order* at 62,007. The Commission was likewise reasonable in declining to attach conclusive weight to Northwest's favorable ranking in Standard and Poor's credit reports, preferring instead to make its own assessment of the degree of risk facing the company. *Id.*

Finally, we hold that the Commission reasonably considered it a risk factor that, although Northwest's facilities were being depreciated over a 50–year period, its long-term contracts had on average only 14 years to run. *Id.* at 62,007–08. In some cases the Commission has examined a pipeline's remaining contract life in isolation, and the CAPP points out that by this measure Northwest compares favorably to other pipelines. The comparison of contract life to depreciable life, however, wants neither logic nor Commission precedent to support it. *See id.* at 62,008 (quoting *Pine Needle LNG Co.*, 75 F.E.R.C. ¶ 61,121 at 61,410, 1996 WL 208856 (Apr. 30, 1996)). Here, the Commission has identified record evidence for its conclusion that the greater than 3:1 ratio of Northwest's remaining period of depreciation to the average life of its contracts was equivalent to or higher than that of other pipeline companies. That evidence is not particularly strong—Northwest's expert conceded upon cross-examination that he did not conduct a comparative "study"—but the Commission was entitled to credit it.

### IV. Conclusion

For the foregoing reasons, the petition for review is

*Dismissed in part and denied in part.*