# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued February 9, 2015         Decided June 16, 2015

No. 13-1138

AERA ENERGY LLC, ET AL.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

ANADARKO ENERGY SERVICES COMPANY, ET AL.,
INTERVENORS

———

Consolidated with 13-1303

———

On Petitions for Review of Orders of
the Federal Energy Regulatory Commission

———

*James F. Moriarty* argued the cause for Petitioner Kern River Gas Transmission Company. With him on the briefs were *Thomas E. Knight*, *Jennifer Brough*, *Matthew T. Eggerding*, and *J. Gregory Porter*.

*Katherine B. Edwards* argued the cause for petitioners Aera Energy LLC, et al. and supporting intervenors. With her on the joint briefs were *John Paul Floom*, *Erica L. Rancilio*, and *Norman A. Pedersen*.

*Lona T. Perry*, Deputy Solicitor, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *David L. Morenoff*, General Counsel, and *Robert H. Solomon*, Solicitor.

*James F. Moriarty*, *Thomas E. Knight*, *Jennifer Brough*, *Matthew T. Eggerding*, and *J. Gregory Porter* were on the brief for intervenor Kern River Gas Transmission Company in support of respondent.

*Andrea J. Chambers*, *Katharine E. Leesman*, *Thomas C. Woodworth*, *Norman A. Pedersen*, *Katherine B. Edwards*, *John Paul Floom*, *Erica L. Rancilio*, *Keith A. Layton*, *John R. Ellis*, *Jonathan J. Newlander*, and *Richard P. Bonnifield* were on the joint brief for intervenors Aera Energy, LLC, et al. in support of respondent.

Before: BROWN, *Circuit Judge*, and SILBERMAN and SENTELLE, *Senior Circuit Judges*.

Opinion for the Court filed by S*enior Circuit Judge* SENTELLE.

Concurring statement filed by *Senior Circuit Judge* SILBERMAN.

SENTELLE, *Senior Circuit Judge*:   Petitioner Kern River Gas Transmission Company owns and operates an interstate pipeline that transports natural gas from its production area in Wyoming to markets in Utah, Nevada, and California.

Petitioners Aera Energy LLC and several other natural gas and transportation companies (collectively "Shippers") ship natural gas using Kern River's pipeline. In their consolidated petitions, Kern River and the Shippers seek review of different aspects of seven orders issued by the Federal Energy Regulatory Commission during rate proceedings. We conclude that the Commission complied with the Natural Gas Act and our precedents. The Commission responded meaningfully to petitioners' objections and articulated a rational explanation for its decisions under the particularly deferential standard of review we apply to ratemaking decisions. We therefore deny the petitions for review.

I.

A. Factual Background

To construct a pipeline, a natural gas company must first obtain a certificate from the Commission. *See* 15 U.S.C. § 717f(c). When Kern River applied for its certificate, then-existing regulations allowed it to obtain an optional certificate and assume the economic risks of the project. FERC approved Kern River's optional certificate and permitted Kern River to charge separate rates during three periods: (1) Period One, the 15-year term of the original contracts; (2) Period Two, the period from the expiration of those contacts to the end of the pipeline's 25-year depreciation life; and (3) Period Three, the period thereafter. *Kern River Gas Transmission Co.*, 50 FERC ¶ 61,069, at 61,150–51 (1990). The Commission also allowed "Kern River to utilize a levelized cost of service" during Period One. *Id.* at 61,150. Using levelized rates, Kern River planned to "recover all of its debt service during the first 15 years, and to recover its return of equity primarily during the second period." *Id.*

Unlike a traditional rate structure, in which a pipeline charges higher rates during the early years of its life, Kern River's levelized rate plan provided lower rates during the early years of operation. Lower initial rates help new pipelines market their capacity and compete with other established pipelines. There is, however, a trade-off. By charging lower rates during the first half of the levelization period, Kern River defers the recovery of costs that it would otherwise recover during the early years of operation if it had used a traditional rate structure. Kern River therefore entered into long-term contracts with the Shippers, which extend beyond the initial period of lower rates, to ensure that it will adequately recover its costs.

With respect to calculating Kern River's return on capital investment, FERC recognized that Kern River would not maintain its original ratio of 70 percent debt and 30 percent equity over the course of the pipeline's life. *Kern River Gas Transmission Co.*, 60 FERC ¶ 61,123, at 61,347 (1992). In accordance with its optional certificate, Kern River would instead retire the debt principal during the first 15 years of the project (*i.e.*, during Period One) and operate with a 100 percent equity capital structure thereafter (*i.e.*, Periods Two and Three). *Id.* FERC noted "that in the latter years of the projects, the rate of return on equity . . . may not be appropriate as the overall rate of return." *Id.* Thus, FERC reserved its right to reexamine the issue in future general rate proceedings. *Id.*

In 1992, FERC issued the certificate order, and Kern River started operating its pipeline. Eight years later, Kern River proposed to lower its shipping rates by refinancing its debt. All existing customers, referred to as "original shippers," extended the terms of their contracts in exchange for lower rates. Some original shippers agreed to new 10-year

contracts (2001 to 2011), while others agreed to new 15-year contracts (2001 to 2016). FERC approved the proposal, allowing levelized rates to continue and permitting Kern River, consistent with its original certificate order, to recover its debt "by the end of the new debt repayment period." *Kern River Gas Transmission Co.*, 92 FERC ¶ 61,061 at 61,157 (2000).

A few years later, Kern River sought to increase the capacity of its pipeline. Because of the unique nature of its existing levelized rate plan, Kern River could not use typical roll-in methodology to recover its expansion costs. Kern River therefore proposed to roll the costs of the proposed expansion into the cost of the original system by adjusting the rates for all "rolled-in" shippers (*i.e.*, existing customers and new expansion customers). *Kern River Gas Transmission Co.*, 96 FERC ¶ 61,137, at 61,576–77 (2001). In 2002, Kern River allowed new expansion customers to choose 10-year or 15-year terms to pay for the additional capacity, and FERC approved the plan. *Id.* at 61,582. In 2003, Kern River again expanded the pipeline and offered its new expansion customers 10-year or 15-year contracts. Kern River thus had six groups of customers paying levelized Period One rates following its second expansion:

- Original shippers with 10-year contracts
  (2001 to 2011)

- 2002 expansion shippers with 10-year contracts
  (2002 to 2012)

- 2003 expansion shippers with 10-year contracts
  (2003 to 2013)

- Original shippers with 15-year contracts
  (2001 to 2016)

- 2002 expansion shippers with 15-year contracts
  (2002 to 2017)

- 2003 expansion shippers with 15-year contracts
  (2003 to 2018).

## B. Procedural Background

In 2004, Kern River filed a general rate case pursuant to Section 4 of the Natural Gas Act, 15 U.S.C. § 717c, seeking to adjust Period One rates (at that time, all customers were paying Period One rates). *Kern River Gas Transmission Co.*, Initial Decision, 114 FERC ¶ 63,031 P 1 (2006). Kern River submitted proposed rates based on a 12-month test period ending in January 2004, "as adjusted for known and measurable changes occurring through October 31, 2004." *Id.* In May 2004, the Commission conditionally accepted Kern River's proposed rates subject to refund and the outcome of further proceedings. *Id.* P 2. After considering testimony and evidence submitted by the parties, an administrative law judge found that Kern River had carried its burden under Section 4 of the Natural Gas Act to prove "that its levelized cost-of-service/ratemaking methodology can produce just and reasonable rates." *Id.* P 253. "However," the administrative law judge concluded that "Kern River ha[d] not proven that its levelized methodology will produce just and reasonable rates if all of its proposed cost-of-service and cost-allocation elements are approved." *Id.*

In a series of orders, the Commission affirmed the administrative law judge's finding that Kern River's adjusted Period One rates should continue to be based on its levelized

methodology and addressed Kern River's subsequent compliance filings with revised cost-of-service and cost-allocation elements. *Kern River Gas Transmission Co.*, Opinion No. 486, Order on Initial Decision, 117 FERC ¶ 61,077 (2006), *order on reh'g*, Opinion No. 486-A, 123 FERC ¶ 61,056 (2008), *order on reh'g*, Opinion No. 486-B, 126 FERC ¶ 61,034 (2009), *order on reh'g*, Opinion No. 486-C, 129 FERC ¶ 61,240 (2009), *order on reh'g*, Opinion No. 486-D, 133 FERC ¶ 61,162 (2010). Relevant here, the Commission conditionally accepted Kern River's compliance filings for Period One rates and set the effective date of those rates as December 17, 2009, the date it issued Opinion No. 486-C. 129 FERC ¶ 61,240 P 14. In the same decision, FERC concluded that it would be "unjust and unreasonable for Kern River to use different reservation billing determinants for allocating costs" to its rolled-in shippers, *id.* P 167, so it "direct[ed] Kern River to use the actual reservation billing determinants of 639,570 [dekatherms] for allocating costs" to its rolled-in shippers, *id.* P 171, and required Kern River "to file revised tariff sheets for Period One Rates within 45 days of the date of [its] order," *id.* P 266(C).

To ensure that the Shippers would benefit from lower Period Two rates, the Commission expanded the scope of the rate proceedings to include Period Two rates. *See* Opinion No. 486, 117 FERC ¶ 61,077 P 37. An administrative law judge held hearings to address, among other things, whether Kern River's return on equity in Period Two should be reduced because of its 100 percent equity capital structure in Period Two. *See* Opinion No. 486-D, 133 FERC ¶ 61,162 P 196. Since "Period Two rates must be designed based on data from the 2004 test period," FERC explained that "any testimony supporting any adjustment above or below the median [return on equity] should similarly be based on 2004

test period information." *Id.* P 197. In other words, "any deviation from the median return on equity for Period Two must be based upon risks that informed investors in 2004 would have perceived concerning Kern River's risks during the 2011 to 2018 time period (the range of expiration dates for Period One contracts)." FERC Br. 47 (citing *Kern River Gas Transmission Co.*, Opinion No. 486-E, Order on Initial Decision, 136 FERC ¶ 61,045 P 201 (2011), and Opinion No. 486-F, 142 FERC ¶ 61,132 P 254 (2013)). Kern River sought to increase its return on equity, while the Shippers argued that it should be reduced. In his initial decision, the administrative law judge found "no persuasive evidence, one way or the other," that justified changing Kern River's return on equity from the median 11.55 percent. *Kern River Gas Transmission Co.*, Initial Decision, 135 FERC ¶ 63,003 P 1026 (2011).

In Opinion No. 486-D, FERC stated that it would consider "circumstances unique to the transition from Period One to Period Two rates that justify an adjustment to the cost of service underlying the Period One rates." 133 FERC ¶ 61,162 P 194. Relying on this statement, Kern River introduced evidence during the Period Two evidentiary hearing to support its proposed cost-of-service adjustment for Period One rates. In his initial decision, the administrative law judge rejected Kern River's proposed cost-of-service adjustment as "not part of this proceeding" because "Period One rates were finalized by Opinion 486-D." 135 FERC 63,003 P 346.

The Commission affirmed the administrative law judge's initial decision on all matters, except one issue not relevant here, and denied rehearing. Opinion No. 486-E, 136 FERC ¶ 61,045, *order on reh'g*, Opinion No. 486-F, 142 FERC ¶ 61,132. The Commission explained that "a party must make a very persuasive case" to overcome its "strong

presumption" in favor of the median return on equity developed by the proxy group. Opinion No. 486-E, 136 FERC ¶ 61,045 P 201. Concluding that neither Kern River nor the Shippers overcame its strong presumption, FERC affirmed the administrative law judge's decision to maintain Kern River's return on equity at 11.55 percent. *Id.* P 206; *see also* Opinion No. 486-F, 142 FERC ¶ 61,132 P 263. The Commission further explained that all issues related to Period One rates had been finalized by Opinion No. 486-D. *See* Opinion No. 486-E, 136 FERC ¶ 61,045 P 8 ("In Opinion No. 486 and the subsequent four orders in the Opinion No. 486 series, the Commission has finally resolved all issues concerning Kern River's Period One rates . . . ."); Opinion No. 486-F, 142 FERC ¶ 61,132 P 8 (same). As a result, it did not address Kern River's argument related to an adjustment to the cost of service underlying the Period One rates.

Kern River filed a timely petition for review of Opinion Nos. 486 through 486-F. It raises two issues: (1) whether FERC erred in setting the effective date for Period One rates; and (2) whether FERC erred by refusing to consider its proposed cost-of-service adjustment for Period One rates after Opinion No. 486-D. The Shippers filed a timely petition for review of Opinion Nos. 486-E and 486-F. They argue that FERC erred when it did not reduce Kern River's return on equity in Period Two. We consolidated the petitions.

II.

Under the Administrative Procedure Act, we will set aside FERC's orders if they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. § 706(2)(A). "[W]e afford great deference to the Commission in its rate decisions." *Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1*, 554 U.S. 527, 532 (2008);

*see also E. Kentucky Power Co-op, Inc. v. FERC*, 489 F.3d 1299, 1306 (D.C. Cir. 2007) ("We are particularly deferential when FERC is involved in the highly technical process of ratemaking.") (internal quotation marks omitted). If FERC "has considered the relevant factors and articulated a rational connection between the facts found and the choice made," we will uphold its decision. *Transcontinental Gas Pipe Line Corp. v. FERC*, 518 F.3d 916, 919 (D.C. Cir. 2008) (internal quotation marks omitted).

### A. Kern River's Petition

Kern River advances several arguments as to why it thinks FERC's orders are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. None have merit.

### 1. Setting the Effective Date of Period One Rates

Kern River contends that FERC's decision to fix the prospective Period One rates as of December 17, 2009, the date it issued Opinion No. 486-C, is contrary to the plain language of the Natural Gas Act and controlling precedent. Kern River asks us to set the effective date of the Period One rates as November 18, 2010, the date FERC accepted Kern River's supplemental compliance filing in Opinion No. 486-D. We reject Kern River's arguments and deny its petition for review.

Before it can fix a new rate, FERC must find the prospective rates "just and reasonable." 15 U.S.C. § 717d(a). Because FERC found an aspect of the prospective Period One rates unjust and unreasonable and ordered Kern River to submit "a substantively new compliance filing," Kern River argues that FERC could not have fixed the rates under

Section 5 of the Natural Gas Act as of the date of Order No. 486-C. Kern River Br. 20. In support of its argument, Kern River relies on *Electrical District No. 1 v. FERC*, where we explained "that the statute means what it says"—when fixing a rate, it is not enough for FERC "to prescribe the legal and accounting principles which, properly applied, will yield one particular rate" because the statute "requires the rate itself to be specified." 774 F.2d 490, 492 (D.C. Cir. 1985) (interpreting the Federal Power Act). In accordance with *Electrical District*, Kern River argued that FERC could not fix Period One rates because the rates were indeterminable as of the date of Opinion No. 486-C. *See* Opinion No. 486-D, 133 FERC ¶ 61,162 PP 16–18. FERC reasonably rejected Kern River's arguments. *Id.* PP 19–31. So do we.

In *Electrical District*, we considered the effective "date of an order setting forth no more than the basic principles pursuant to which the new rates are to be calculated." 774 F.2d at 493. We vacated the order because it fixed the effective date of the prospective rates as of the date FERC ordered the utility to make a new compliance filing. *Id.* at 491–93. We concluded that the order lacked "necessary predictability" and thus required FERC to fix the date once the "numerical rate is specified." *Id.* at 492–93. Even though *Electrical District* "adopted a bright-line insistence that a numerical rate be 'specified'" before it can be fixed, *Transwestern Pipeline Co. v. FERC*, 897 F.2d 570, 577 (D.C. Cir. 1990), another decision, *Public Service Co. of New Hampshire v. FERC*, 600 F.2d 944, 954 (D.C. Cir. 1979), permitted FERC to fix rates subject to adjustments. We "reconciled" those decisions in *Transwestern* and explained:

> The Commission need not confine rates to specific, absolute numbers but may approve a tariff containing a rate "formula" or a rate "rule" (as *Public Service Co.*

> *of New Hampshire* assumed); it may not, however, simply announce some formula and *later* reveal that the formula was to govern from the date of announcement (as it had done in *Electrical District*).

897 F.2d at 578 (emphasis in original).

The circumstances here, FERC correctly determined, are unlike those in *Electrical District*. *See* Opinion No. 486-D, 133 FERC ¶ 61,162 PP 24–25. When it fixed Kern River's Period One rates as of the date of Opinion No. 486-C, "the Commission had done much more than set forth the basic principles of [those] rates." *Id.* P 26. Indeed, by the time the Commission fixed Period One rates, they had already been the subject of a full hearing before an administrative law judge, a post-hearing decision, and three FERC orders (Opinion Nos. 486, 486-A, and 486-B). *Id.* P 24. Moreover, FERC had previously directed Kern River to submit compliance filings with revised Period One rate calculations. *See* Opinion No. 486-B, 126 FERC ¶ 61,304 P 192. "On March 2, March 27, and September 22, 2009, Kern River submitted the required compliance filings, and the Commission accepted those filings, subject to conditions in Opinion No. 486-C." Opinion No. 486-D, 133 FERC ¶ 61,162 P 24. Those conditions, FERC concluded, are analogous to the circumstances in *Transwestern* because, like a formula or rule, FERC's order gave Kern River no discretion to make further changes to its rates. *Id.* P 28.

Kern River suggests, however, that *Transwestern* is inapplicable because its tariff contains neither a formula nor a rule; instead, it contains "rate models." *See, e.g.*, Kern River Br. 21, 26–27, 29. Since its rate models are so complex, Kern River points out that "no party (not Kern River, FERC, nor any shipper) knew the effective prospective Period One rates

until all levelized rate models had been rerun with the changed components." Kern River Br. 27; *see also* Opinion No. 486-D, 133 FERC ¶ 61,162 P 18 (same). FERC reasonably rejected this argument because "the rate uncertainty that concerned the court in *Electrical District* was not present here to the same degree." *Id.* P 26. We agree.

FERC's conditional acceptance of Period One rates in Opinion No. 486-C simply required Kern River to substitute one number for another when allocating costs to the rolled-in shippers. *See* 129 FERC ¶ 61,240 P 171 (directing Kern River to use 639,570 dekatherms as the billing determinant). Because this mechanical change gave Kern River no discretion to adjust its rate models, FERC provided sufficient notice to ratepayers. *See W. Deptford Energy, LLC v. FERC*, 766 F.3d 10, 22 (D.C. Cir. 2014) (recognizing that FERC need not confine rates to specific numbers when ratepayers have notice of the formula or rule that will be applied).

The Shippers, moreover, could have calculated the rates on their own. *See Kern River Gas Transmission Co.*, 119 FERC ¶ 61,106 P 9 (2007) (requiring Kern River to furnish all Shippers "with electronic copies of each model, with cells, links, formulae and data intact"). Because the Shippers could "supply their own inputs to the [models] and thereby know the numerical rates," FERC reasonably fixed the rates "within the meaning of Natural Gas Act § 5" as of the date it accepted Kern River's compliance filings in Opinion No. 486-C. *City of Anaheim v. FERC*, 558 F.3d 521, 524 (D.C. Cir. 2009) (citing *Transwestern*, 897 F.2d at 578). In light of the great deference we give FERC in rate decisions, FERC's order setting the effective date of Period One rates as December 17, 2009 was not arbitrary, capricious, or otherwise not in accordance with law.

## 2. Adjusting the Period One Rate Credit

Kern River argues that FERC failed to respond meaningfully to its objections, and the Commission's nonresponse rendered its decisions arbitrary and capricious. *See, e.g.*, *PSEG Energy Res. & Trade LLC v. FERC*, 665 F.3d 203, 210 (D.C. Cir. 2011). Under Kern River's approved rolled-in methodology, it recovers Period One costs by adjusting the credit that it gives to different groups of rolled-in shippers. As rolled-in shippers transition from Period One to Period Two rates, Kern River loses revenue because Period Two rates are lower than Period One rates. Kern River contends that FERC ignored its request to adjust the credit that it gives to rolled-in shippers paying Period One rates as rolled-in shippers transition to Period Two rates. Kern River also argues that FERC abused its discretion by not reopening the evidentiary record. These arguments lack merit.

At the outset, FERC suggests that we need not consider Kern River's argument because it "twice waived" any contention that Opinion No. 486-D was not final—Kern River never raised the argument on rehearing before the Commission or in its opening brief here. *Xcel Energy Servs. Inc. v. FERC*, 510 F.3d 314, 318 (D.C. Cir. 2007); *see also* 15 U.S.C. § 717r(b) ("No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure to do so."). In response, Kern River characterizes FERC's waiver argument as a post-hoc rationalization and reminds us that the "agency's order must be upheld . . . on the same basis articulated in the order by the agency itself." *PSEG Energy Res. & Trade*, 665 F.3d at 210 (internal quotation marks omitted).

We uphold FERC's decisions because "the agency's path may reasonably be discerned" from the record. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Bowman Transp. Inc. v. Arkansas-Best Freight Sys.*, 419 U.S. 281, 286 (1974)). FERC did not address Kern River's proposed cost-of-service adjustment because the Commission was satisfied with the administrative law judge's reasoning that Period One rates had already been finalized. Moreover, FERC reasonably refused to adjust Period One rates in a Period Two hearing because the cribbed language from Opinion No. 486-D relied on by Kern River only addressed Period Two rates.

FERC acknowledges that it did not reiterate the administrative law judge's analysis related to Kern River's proposed cost-of-service adjustment for Period One rates in Opinion Nos. 486-E and 486-F. However, "[t]he Commission is not required to recapitulate the reasoning of the [administrative law judge] if it is satisfied that the initial decision and the reasoning underlying it are sound." *Boroughs of Ellwood City v. FERC*, 731 F.2d 959, 967 (D.C. Cir. 1984). Here, the administrative law judge rejected Kern River's proposed cost-of-service adjustment because "Period One rates were finalized by Opinion 486-D." *Kern River Gas Transmission Co.*, 135 FERC 63,003 P 346. Satisfied with this reasoning, FERC twice reiterated that all issues related to Period One were finalized by Opinion No. 486-D; even Kern River acknowledges that. *See* Kern River Br. 37 (citing Opinion No. 486-E, 136 FERC ¶ 61,045 P 8, and Opinion No. 486-F, 142 FERC ¶ 61,132 P 8 (same)). Under these circumstances, FERC's failure to address Kern River's specific argument was neither arbitrary nor capricious.

Kern River misreads Opinion No. 486-D as an invitation to reopen the Period One evidentiary record to adjudicate its

proposed cost-of-service adjustment for Period One rates.  As we have previously explained:  "Reopening an evidentiary hearing is a matter of agency discretion, and is reserved for extraordinary circumstances."  *Cities of Campbell v. FERC*, 770 F.2d 1180, 1191 (D.C. Cir. 1985) (citations omitted). Kern River nonetheless contends that FERC abused its discretion because the adjustment to the rolled-in rate credit is an extraordinary circumstance.  We disagree.

The Commission's basis for refusing to consider Kern River's rolled-in rate credit argument can be reasonably discerned from the record.  *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.  Starting with Opinion No. 486, FERC determined that Period Two rates would be based on the same cost-of-service adjustment used for Period One rates.  117 FERC ¶ 61,077 P 54 (directing Kern River to file proposed Period Two rates "based upon the instant cost of service" used for Period One rates).  As FERC explained in Opinion No. 486-D, "The only exception to this general approach to developing *Kern River's Period Two rates* is where there are circumstances unique to the transition from Period One to Period Two rates that justify an adjustment to the cost of service underlying the Period One rates."  133 FERC ¶ 61,162 P 194 (emphasis added); *see also id.* P 202 ("In general, this should lead to the use of the same cost of service for *the Period Two rates* as for the Period One rates, except where circumstances unique to the transition from Period One to Period Two rates justify projecting different costs or volumes than used in developing the Period One rates." (emphasis added)).  Kern River misreads Opinion No. 486-D because FERC only considered making adjustments that would affect *Period Two rates*; it did not reopen the Period One evidentiary record to adjudicate Kern River's proposed cost-of-service adjustment for Period One rates.  Indeed, even Kern River acknowledges that FERC acted consistent with the

Commission's reading of Opinion No. 486-D. *See* Kern River Br. 44 (explaining how FERC only approved "adjustments to the Rolled-In Rate Credit for Period Two").

In sum, FERC correctly set the effective date of Period One rates as December 17, 2009, and FERC did not abuse its discretion by refusing to reopen the Period One evidentiary record after it issued Opinion No. 486-D. Kern River advances additional arguments, but none warrant relief or compel further discussion.

## B. Shippers' Petition

Because of the reduced financial risk associated with being debt free in Period Two, the Shippers urged FERC to lower Kern River's return on equity for Period Two rates. FERC refused. The Shippers argue that FERC failed to engage in reasoned decision making after it: (1) failed to address the reduced financial risk associated with 100 percent equity in Period Two; (2) relied on an irrational composite capital structure; (3) assumed increased business risk would offset decreased financial risk; and (4) failed to follow its precedent, which requires a reduction in the return on equity. The Shippers ask us to reverse Opinion Nos. 486-E and 486-F and remand with instructions for FERC to reduce Kern River's return on equity in Period Two. We deny the Shippers' petition under the deferential standard of review we apply to FERC's ratemaking decisions.

## 1. Financial Risk

In general, "the higher the proportion of equity capital, the lower the financial risk . . . and thus, in this respect, the lower the necessary rate of return" on equity. *Missouri Pub. Serv. Comm'n v. FERC*, 215 F.3d 1, 2 (D.C. Cir. 2000).

During Period Two rate proceedings, FERC confirmed: "It goes without saying that a 100 percent equity structure would be perceived by informed investors to lessen substantially a company's financial risk." Opinion No. 486-F, 142 FERC ¶ 61,132 P 255. That is common sense. *See Missouri Pub. Serv. Comm'n*, 215 F.3d at 4. Because Kern River has lower financial risk than the members of the 2004 proxy group (based on Kern River's 100 percent equity structure), the Shippers maintain that FERC should have set Kern River's return on equity lower than the proxy group's median 11.55 percent return.

FERC reasonably explained why the Shippers' argument lacks merit. When it set Kern River's return on equity for Period Two, FERC considered how investors in 2004 would have viewed the transition from a 30 percent equity structure in Period One to the 100 percent equity structure in Period Two. *See* Opinion No. 486-E, 136 FERC ¶ 61,045 P 204–05. FERC explained how an informed investor would have noticed that the transition toward less financial risk is not abrupt. *See id.* Instead, the "100 percent equity structure would come on line gradually from 2011 through 2018." *Id.* P 205. For example, through the end of 2015 (more than halfway into the transition period), 88 percent of the Period One contracts would still be in effect. *See id.* Thus, FERC explained that an investor in 2004 would have likely perceived that, during the initial four years of transition to Period Two rates, Kern River's financial risk would be about the same as Period One. *See id.* The investor's perception of the gradual transition, FERC determined, "would trend the required [return on equity] toward the median rather than the lower end of the range in absence of highly persuasive information (evidence) to the contrary." *Id.*; *see also id.* P 206 (noting that the Shippers "have not presented compelling evidence based on the 2004 test period that Kern

River's return on equity should be reduced below the median"). That is not an arbitrary conclusion.

## 2. Composite Equity

The Shippers contend that FERC unjustifiably abandoned the notion of separate capital structures in Period One and Period Two when it referred to a "composite equity" standard. Shippers Br. 21 (quoting Opinion No. 486-E, 136 FERC ¶ 61,045 P 205). In their view, FERC's reference to composite equity is inconsistent with the design principles underlying Kern River's levelized rates—*i.e.*, Kern River must develop "individual rates based upon separately calculated equity rate base amounts for each customer class." Opinion No. 486, 117 FERC ¶ 61,077 P 119. According to the Shippers, it is irrelevant to the design of Period Two rates that some customers might still be paying Period One rates (based on a 30 percent equity capital structure) through 2018 because FERC must calculate Period Two rates based on a 100 percent capital structure.

We reject the Shippers' arguments because they ignore the context of the Commission's reference to "composite equity" in Opinion No. 486-E. Considering the reference in context, we conclude that FERC did not abandon the separate capital structures for each period when it referred to composite equity. Rather, FERC explained how an investor in 2004 might perceive Kern River's "generic business risks" during the gradual transition to Period Two rates from 2011 through 2018. Opinion No. 486-E, 136 FERC ¶ 61,045 P 205; *see also* Opinion No. 486-F, 142 FERC ¶ 61,132 P 254 ("[T]his language forms part of the Commission's discussion of what informed investors might have perceived in 2004 about Kern River's business risk."). By referring to composite equity, FERC rejected the notion that "the 2004

investor would be considering investment in a pipeline that would have exclusively Period Two contracts and a Period Two all-equity capital structure." Opinion No. 486-F, 142 FERC ¶ 61,132 P 236. This observation is rational and consistent with FERC's position throughout these proceedings.

### 3. Business Risk

The Shippers advance several arguments suggesting that FERC's analysis of Kern River's business risk is inconsistent and not supported by the record. None are persuasive.

The Shippers urged FERC to set Kern River's return on equity at the lowest reasonable level because, in their view, Kern River's business risk is substantially reduced during Period Two by the 100 percent equity structure. FERC explained that a low return on equity would only be appropriate if "Kern River's business risk would necessarily be so low that investors could be assured that changes in Kern River's capital structure would *offset all of the potential competition* from new pipeline capacity or gas supply." Opinion No. 486-E, 136 FERC ¶ 61,045 P 204 (emphasis added). After considering the Shippers' arguments, FERC concluded that "the existence of the 100 percent equity capital structure cannot be construed to completely off-set the potential business risks Kern River might face." Opinion No. 486-F, 142 FERC ¶ 61,132 P 257. That conclusion is neither arbitrary nor capricious.

First, FERC determined the record was insufficient to conclude that the change in capital structure over time would completely offset "incentive[s] for entry by competing firms," which "would be hard to quantify in 2004." Opinion No. 486-E, 136 FERC ¶ 61,045 P 204. FERC rejected the

Shippers' retrospective analysis of Kern River's potential competition because it relied on "more detailed information that . . . [became] available some seven years after the close of the 2004 test period." *Id.* In doing so, FERC engaged in reasoned decision making because the return on equity analysis "depends upon market perception of future risks" and FERC, as of the 2004 test period, "reasonably factored evidence of potential competition into its [return on equity] calculus." *Canadian Assoc. of Petroleum Producers v. FERC*, 308 F.3d 11, 16 (D.C. Cir. 2002).

Second, FERC concluded that the record did "not provide compelling evidence that" the gradual transition in capital structure would completely offset Kern River's re-contracting risk as Period One contracts expired. Opinion No. 486-E, 136 FERC ¶ 61,045 P 204. As of the 2004 test period, no customer had agreed to contract with Kern River for shipping natural gas during Period Two. *See* Opinion No. 486-D, 133 FERC ¶ 61,162 P 198. Therefore, re-contracting risk was "the primary reason" FERC did not adjust Kern River's return on equity for Period Two rates. Opinion No. 486-F, 142 FERC ¶ 61,132 P 250. The Shippers challenge FERC's reliance on re-contracting risk, but their arguments lack merit because they ignore the context of FERC's purportedly inconsistent statements.

According to the Shippers, FERC recognized that re-contracting risk is not unique to Kern River. The Shippers, however, misread FERC's statements. While rejecting Kern River's argument in favor of a higher "return on equity based on evidence concerning various market changes *since the 2004 test period*," FERC explained that re-contracting risk is "not a circumstance unique to the transition from Period One to Period Two." *Id.* P 245 (emphasis added). In other words, FERC rejected Kern River's proposed increase because it was

not based on data from the 2004 test period and did not fall within the limited "circumstances unique to the transition from Period One to Period Two rates." Opinion No. 486-D, 133 FERC ¶ 61,162 P 202. When put into context, FERC reasonably explained how re-contracting risk was not an issue unique to the transition and therefore did "not justify consideration of post-test period market changes." Opinion No. 486-F, 142 FERC ¶ 61,132 P 245. FERC's statements about re-contracting risk are not inconsistent.

The Shippers suggest that FERC cited lower Period Two rates as a factor that would reduce re-contracting risk. Again, context matters. While addressing the return on equity *for Period One rates*, FERC noted: "Kern River's competitive position should be enhanced" as the reduced Period Two rates become effective. Opinion No. 486-B, 126 FERC ¶ 61,034 P 148. Thus, in the context of analyzing *Period One risk*, FERC concluded that "Kern River exaggerates its financial risk," while the Shippers "understate Kern River's contract risk given its relative dependence on the more competitive generating market." *Id.* The Shippers also cite language from Opinion No. 486-E where FERC considered adjusting the "load factor" for Period Two rates. 136 FERC ¶ 61,045 P 169. The parties updated the "record with market information for the period of 2004–2009," *id.*, and FERC acknowledged that Kern River "has been quite effective at competing" for market capacity based on its lower Period Two rates, *id.* P 171. When put into context, neither this statement nor FERC's statement about Period One risk is inconsistent with FERC's analysis of re-contracting risk as perceived by an investor in 2004.

The Shippers further contend that re-contracting risk during the transition period "'would unlikely have been visible even to the most discerning [2004] investor.'"

Shippers' Reply Br. 6 (quoting Opinion No. 486-E, 136 FERC ¶ 61,045 P 200). Once again, the Shippers ignore context because FERC made this statement while referring to "events that actually occurred in 2010 and 2011," which were "not properly before the Commission." Opinion No. 486-E, 136 FERC ¶ 61,045 P 200. FERC never concluded that a 2004 investor would be unlikely to perceive re-contracting risk. Instead, FERC reasonably explained that it would be "unlikely" for a 2004 investor to perceive "*the specifics underpinning*" Kern River's argument in favor of a "higher risk environment"—*i.e.*, the 2004 investor would not be able to predict circumstances based on updated data from actual events in 2010 and 2011. *Id.* (emphasis added). When viewed in its proper context, FERC's statement about the visibility of re-contracting risk is consistent with its analysis of Kern River's business risk as perceived by a 2004 investor.

Because FERC rejected re-contracting risk as a basis for decreasing rate design volumes, the Shippers argue it is inconsistent for FERC to refuse to lower Kern River's return on equity based on re-contracting risk. Their argument misses the mark because the rate design analysis for volume takes post-2004 test period data into account, whereas the return on equity analysis does not. Simply put, FERC has not advanced inconsistent positions while analyzing how a 2004 investor would view Kern River's re-contracting risk.

4. Precedent

The Shippers contend that FERC departed from its precedent without providing a reasoned explanation. We disagree.

FERC acknowledged that Kern River's 100 percent equity capital structure is "unique" and "anomalous." *See,*

*e.g.*, Opinion No. 486-F, 142 FERC ¶ 61,132 P 262. In other unique situations involving atypically high equity ratios, FERC has adjusted the rate of return on equity downward. *See, e.g.*, *Williams Natural Gas Co.*, 77 FERC ¶ 61,277, at 62,192 (1996) (adjusting the pipeline's return on equity "to account for the [reduced] financial risk associated with a high equity ratio"); *Gateway Pipeline Co.*, 55 FERC ¶ 61,488, at 62,677 (1991) (rejecting the pipeline's "atypical and unduly costly" 100 percent equity capitalization and proposed rate of return in favor of a lower rate); *Tarpon Transmission Co.*, 41 FERC ¶ 61,044, 1987 WL 258004, at *6 (1987) (rejecting the pipeline's 100 percent equity structure as "beyond the norm" and reducing the rate of return on equity). FERC reasonably explained how these orders are not persuasive in the context of Kern River's rate proceedings because they involved pipelines certified under the traditional requirements of Section 7 of the Natural Gas Act. *See* Opinion No. 486-F, 142 FERC ¶ 61,132 P 262. None of the pipelines had optional certificates similar to Kern River's certificate. "In this context, Kern River's capital structure is unique, and comparisons to other pipelines' equity ratios do not render it any more or less anomalous." *Id.* FERC reasonably explained that the cases relied on by the Shippers "show nothing more than the Commission has previously adjusted the return on equity in appropriate circumstances" that do not apply here. FERC Br. 62.

The Shippers raise additional arguments, but none warrant relief or compel further discussion.

25

\* \* \*

Under the particularly deferential standard of review we apply to the Commission's ratemaking decisions, we deny the petitions for review.

*So ordered.*

SILBERMAN, *Senior Circuit Judge*, concurring: I wish FERC's briefing was as clear as Judge Sentelle's opinion.